**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| CHRIS STALLINGS , individually and on behalf of all others similarly situated,<br><br>                              Plaintiff,<br><br>v.<br><br>XCERRA CORP., ROGER W. BLETHEN, DAVID G. TACELLI, MARK S. AIN, ROGER J. MAGGS, JORGE TITINGER, BRUCE R. WRIGHT,<br><br>                              Defendants. | C.A. No. 1:17-cv-11579<br><br>JURY TRIAL DEMANDED |

**CLASS ACTION COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAWS**

Plaintiff Chris Stallings ("Plaintiff"), by his attorneys, alleges upon information and belief, except for his own acts, which are alleged on knowledge, as follows:

**NATURE AND SUMMARY OF THE ACTION**

1.      Plaintiff brings this action on behalf of himself and the public stockholders of Xcerra Corporation ("Xcerra" or the "Company") against Xcerra and Xcerra's Board of Directors (the "Board" or the "Individual Defendants," as further defined below, and together with the Company "Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a), and U.S. Securities and Exchange Commission ("SEC")  Rule 14a-9 promulgated thereunder, 17 C.F.R. § 240.14a-9.  Specifically, Defendants solicit shareholder votes in connection with an attempt to sell the Company to an affiliate of Sino IC Capital, through a proxy statement that omits material facts necessary to make the statements therein not false or misleading.  Unless these disclosure deficiencies are cured, the

Company's stockholders will be forced to decide whether to vote their shares in favor of the Proposed Transaction (defined below) based upon a materially incomplete and misleading proxy statement.

2.      On April 10, 2017, Xcerra and Sino IC Capital issued a joint press release announcing that they had entered into an Agreement and Plan of Merger dated April 7, 2017 (the "Merger Agreement"), under which an affiliate of Sino IC Capital, Unic Capital Management Co., Ltd. ("Unic Capital") would acquire all of Xcerra's outstanding stock.  On August 4, 2017, Unic Capital assigned their rights under the Merger Agreement to Hubei Xinyan Equity Investment Partnership (Limited Partnership) ("Parent").  Unic Capital is the controlling shareholder of the general partner of Parent.  Under the terms of the Merger Agreement, as amended, Parent, through its wholly-owned subsidiary, Unic Acquisition Corporation ("Merger Sub" and collectively with Sino IC Capital, Unic Capital, and Parent, "Sino"), would acquire all of the outstanding shares of Xcerra for $10.25 per share in cash (the "Merger Consideration").  The transaction between Xcerra and Sino (the "Proposed Transaction") has a total value of approximately $580 million.

3.      On August 7, 2017, Defendants issued materially incomplete and misleading disclosures in the Form PREM14A Preliminary Proxy Statement (the "Proxy") filed with the SEC in connection with the Proposed Transaction.

4.      The Proxy is deficient and misleading because, *inter alia*, it omits material information about the facts and circumstances that led up to the Proposed Transaction, as well as material information concerning the financial analyses conducted by Cowen and Company, LLC ("Cowen"), the Company's financial advisor.  Without all material information, Xcerra stockholders cannot make a properly informed decision regarding whether to vote in favor of the Proposed Transaction.

5.      By unanimously authorizing the issuance of the Proxy, the Individual Defendants participated in the solicitation even though they knew, or should have known, that the Proxy was materially false and/or misleading.

6.      The failure to adequately disclose such material information constitutes a violation of Sections 14(a) and 20(a) of the Exchange Act, and SEC Rule 14a-9 promulgated thereunder, as stockholders need such information in order to make a fully-informed decision in determining how to vote on the Proposed Transaction.  For these reasons, and as set forth in greater detail herein, Plaintiff seeks to enjoin the Defendants from conducting the stockholder vote on the Proposed Transaction unless and until the material information discussed below is disclosed to Xcerra's stockholders or, in the event the Proposed Transaction is consummated, to recover damages resulting from Defendants' violations of federal securities laws and regulations.  Judicial intervention is warranted here to rectify existing and future irreparable harm to the Company's stockholders.

## JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question jurisdiction) and Section 27 of the Exchange Act (15 U.S.C. § 78aa) because Plaintiff alleges violations of Sections 14(a) and 20(a) of the Exchange Act and SEC Rule 14a-9.

8.      The Court has personal jurisdiction over each Defendant because each either conducts business in and maintains operations in this District or is an individual who either is present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

9.      Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391, because: (a) Xcerra maintains its headquarters in this District; (b) the conduct at issue took place and had an effect in this District; (c) a substantial portion of the corporate transactions and wrongs complained of herein occurred here; and (d) Defendants have received substantial compensation and other transfers of money here by doing business here and engaging in activities having an effect in this District.

## PARTIES AND RELEVANT NON-PARTIES

10.     Plaintiff is, and has been at all relevant times, the owner of shares of common stock of Xcerra.

11.     Xcerra is a corporation organized and existing under the laws of the State of Massachusetts.  It maintains headquarters at 825 University Avenue, Norwood, Massachusetts 02062.  Xcerra's common stock trades on NASDAQ under the ticker symbol "XCRA."

12.     Defendant Roger W. Blethen ("Blethen") has served as chairman of the board since December 2008 and as a director of the Company since 1980.

13.     Defendant David G. Tacelli ("Tacelli") has served as president of the Company since 2002 and as chief executive officer ("CEO") and a director of the Company since November 2005.

14.     Defendant Mark S. Ain ("Ain") has served as a director of the Company since 2001 and as lead independent director of the Company since June 2010.

15.     Defendant Roger J. Maggs ("Maggs") has served as a director of the Company since June 1994.

16.     Defendant Jorge Titinger ("Titinger") has served as a director of the Company since August 2012.

17.     Defendant Bruce R. Wright ("Wright") has served as a director of the Company since August 2008.

18.     Defendants Blethen, Tacelli, Ain, Maggs, Titinger, and Wright are collectively referred to as "Individual Defendants" and/or the "Board."

19.     Relevant non-party Sino IC Capital is a limited liability company organized and existing under the laws of the People's Republic of China ("PRC").

20.     Relevant non-party Unic Capital, a related party of Sino IC Capital, is a capital and asset management firm organized and existing under the laws of PRC.

21.     Relevant non-party China Integrated Circuit Industry Investment Fund Co., Ltd ("Sponsor") is a related party of Unic Capital and is managed by Sino IC Capital.  Sponsor is providing equity commitments for the consummation of the Proposed Transaction.

22.     Relevant non-party Parent is a limited partnership organized and existing under the laws of PRC which was established solely for the purposes of effectuating the Proposed Transaction.  Unic Capital is the controlling shareholder of the general partner of Parent.  Sponsor is the largest limited partner of Parent.

23.     Relevant non-party Merger Sub is a corporation organized and existing under the laws of Massachusetts, is a controlled subsidiary of Parent, and was formed on July 17, 2017 solely for the purposes of effectuating the Proposed Transaction.

## CLASS ACTION ALLEGATIONS

24.     Plaintiff brings this action individually and as a class action on behalf of all holders of Xcerra common stock who are being, and will be, harmed by Defendants' actions described herein (the "Class").  Excluded from the Class are Defendants herein and any person, firm, trust,

corporation, or other entity related to, controlled by, or affiliated with, any Defendant, including the immediate family members of the Individual Defendants.

25.     This action is properly maintainable as a class action under the Federal Rule of Civil Procedure 23.

26.     The Class is so numerous that joinder of all members is impracticable.  According to the Proxy, as of July 10, 2017, Xcerra had 54,267,275 shares of common stock outstanding. While the exact number of Class members is presently unknown to Plaintiff and can only be ascertained through discovery, Plaintiff believes that there are thousands of members in this Class. All members of the Class may be identified from records maintained by Xcerra or its transfer agent and may be notified of the pendency of this action by mail, using forms of notice similar to that customarily used in securities class actions.

27.     There are questions of law and fact which are common to the Class and which predominate over questions affecting any individual Class member.  The common questions include, *inter alia*, the following: (i) whether Defendants solicited stockholder approval of the Proposed Transaction through a materially false or misleading Proxy in violation of federal securities laws; (ii) whether Plaintiff and other Class members will suffer irreparable harm if such securities laws violations are not remedied before the vote on the Proposed Transaction; and (iii) whether the Class is entitled to injunctive relief as a result of Defendants' wrongful conduct as alleged herein.

28.     Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class.  Plaintiff and the other members of the Class have sustained damages as a result of Defendants' wrongful conduct as alleged herein.

29.     Plaintiff will fairly and adequately protect the interests of the Class and has retained competent counsel experienced in litigation of this nature.

30.     The prosecution of separate actions by individual members of the Class creates a risk of inconsistent or varying adjudications with respect to individual members of the Class, which could establish incompatible standards of conduct for Defendants.

31.     Plaintiff anticipates that there will be no difficulty in the management of this litigation.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

32.     Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

33.     Accordingly, Plaintiff seeks injunctive and other equitable relief on behalf of himself and the Class to prevent the irreparable injury that the Company's stockholders will continue to suffer absent judicial intervention.

## FURTHER SUBSTANTIVE ALLEGATIONS

### Company Background

34.     Xcerra provides semiconductor and electronics testing equipment to manufacturers and is the parent company of atg-Luther & Maelzer, Everett Charles Technologies, LTX-Credence, and Multitest.

### The Sale Process

35.     On May 27, 2015, the Board met and discussed a potential divestiture of Xcerra's board fabrication business (the "Hong Kong Divestiture") to a Chinese Company, Party A.  The Board reviewed the potential transaction and directed management to negotiate with Party A.

36.     From May 27, 2015 through August 27, 2015, Xcerra negotiated the terms of the Hong Kong Divestiture and Party A also suggested a potential joint venture between Xcerra and Party A (the "Hong Kong Joint Venture").

37.     On August 27, 2015, the Board determined to approve the Hong Kong Divestiture and instructed management to work towards closing the transaction.

38.     On October 21, 2015, Defendant Tacelli and Mark J. Gallenberger ("Gallenberger"), Xcerra's chief financial officer ("CFO") and chief operating officer ("COO"), met with Party A to discuss the Hong Kong Divestiture and the Hong Kong Joint Venture.  After discussing the potential transactions the parties determined to first concentrate on closing the Hong Kong Divestiture and to consider the Hong Kong Joint Venture thereafter.

39.     On November 19, 2015, the Board met and Defendant Tacelli and Gallenberger updated the Board as to the conversations with Party A on October 21, 2015.  The Board instructed management to continue discussions concerning the Hong Kong Joint Venture.

40.     On December 1, 2015, Xcerra completed the Hong Kong Divestiture.

41.     On December 10, 2015, Defendant Tacelli and Rich Yerganian ("Yerganian"), Xcerra's vice president of investor relations, met with representatives of Cowen to discuss Xcerra's growth strategies and potential opportunities for expansion in China.

42.     In January and February of 2016, Company management engaged in additional discussions with Party A regarding the Hong Kong Joint Venture; however, the discussions did not result in consummation of the venture and discussions between Party A and Xcerra management ended.

43.     On February 23, 2016, the Board met and discussed the importance of the Chinese market for Xcerra's continued growth, the closing of the Hong Kong Divestiture, and subsequent

discussions with Party A regarding the Hong Kong Joint Venture.  Defendant Tacelli then led a discussion on various growth strategies the Company could pursue, both in China and generally.

44.     On March 30, 2016, Cowen and Company management met at Xcerra's headquarters to discuss Xcerra's growth strategies in the Chinese market and Cowen's experience in semiconductor industries and ways it could assist the Company with their efforts in the Chinese market.

45.     On April 13, 2016, the Board met and determined that Xcerra would benefit from engaging with a financial advisor to assist in exploring strategic partnerships and growth opportunities in China.  The Board also determined to limit their exploration to Chinese counterparties, but that it would consider any acquisition of the Company if such opportunity arose.  The Board then discussed the qualifications of various investment banks, and concluded that Cowen would best serve the Company's interests as its financial advisor.  As such, the Board unanimously approved the engagement of Cowen to assist with the search for strategic opportunities.

46.     On April 14, 2016, Company management and Cowen held a phone call during which management directed Cowen to reach out to seven Chinese parties (the "Initial Potential Partners"), Parties B, C, D, E, F, G, and H, each of which Cowen identified as a party that may be interested in a strategic transaction with Xcerra.

47.     On April 19, 2016, Cowen and Xcerra signed an engagement letter.

48.     Beginning on April 19, 2016, at the direction of Company management, Cowen approached each of the Initial Potential Partners.  Following such approach, each Initial Potential Partner entered into non-disclosure agreements with Xcerra.  In addition, with respect to Sino IC Capital, a non-disclosure agreement was executed by Party B, another Initial Potential Partner,

which covered materials provided to Sino IC Capital due to it being a potential financing source of Party B.

49.     Between May 17, 2016 and May 20, 2016, Defendant Tacelli, Gallenberger, and Cowen met with Party B (together with Sino IC Capital), Party C, Party D, Party E, Party F, and Party G in China to discuss a potential strategic transaction with Xcerra.  No discussion of any price-related terms resulted from the discussions with Party B (together with Sino IC Capital), Party C, Party D, Party E, Party F, or Party G that took place on these days.  Of the seven Initial Potential Partners contacted, only one, Party H, declined to meet with Xcerra management, and thus no such meeting occurred.

50.     From May 24, 2016 through May 29, 2016, Cowen reached out to Party C, Party D, Party E, Party F, Party G and Sino IC Capital to further discuss their interest.  Party C indicated it remained interested.  Sino IC Capital indicated that it was interested and informed the company that due to Party B's smaller size, Party B would not pursue a strategic transaction, and instead Party B would serve as Sino IC Capital's technical advisor during its evaluation of potential strategic transactions with Xcerra.  Each of the remaining Initial Potential Parties indicated they would continue to conduct internal evaluations of a potential transaction with Xcerra.

51.     On May 24, 2016, Party F informed Cowen it was not interested in pursuing a strategic transaction with Xcerra at that time.

52.     During June 2016, Party C and Sino IC Capital engaged in due diligence of Xcerra.

53.      On June 14, 2016, Party D and Party E each indicated to Cowen that they were not interested in pursuing a strategic transaction with Xcerra at that time.

54.     On July 5, 2016, Defendant Tacelli and Gellenberger met with Party C to discuss further due diligence questions it had raised.

55.     On July 20, 2016, Party G reached out to Cowen and indicated it was interested in participating in due diligence efforts concerning Xcerra.

56.     On July 21, 2016, Party C informed Cowen it was not interested in pursuing a strategic transaction with Xcerra at that time.

57.     On July 29, 2016, Xcerra management and Cowen met with Sino IC Capital and Party B to further discuss a potential strategic transaction.

58.     On August 18, 2016, Sino IC Capital provided Cowen with a non-binding offer to acquire 100% of Xcerra's outstanding common stock for $7.75 in cash (the "Initial IOI").  The closing price of Xcerra's common stock on August 19, 2016 was $6.08.

59.     On August 25, 2016, the Board met to discuss the Initial IOI and determined that the offer price was insufficient.  The Board directed Cowen to inform Sino IC Capital that the Initial IOI was insufficient and to offer a counterproposal of $14.00 per share.  During this meeting the Board also established a Strategic Transaction Committee (the "Strategic Committee"), comprised of Defendant Blethen and Defendant Titinger.

60.     On August 27, 2016, Cowen informed Sino IC Capital's financial advisor ("Sino IC Capital Financial Advisor") of the counter proposal.  Sino IC Capital Financial Advisor responded that the $14.00 was too high and would be rejected by Sino IC Capital.

61.     On August 29, 2016, the Strategic Committee held a meeting attended by two other members of the Board and certain members of Company management.  During this meeting, the participants discussed their rejected counterproposal, and determined to send a response to Sino IC Capital relating to the Initial IOI which simply stated that the price in the Initial IOI was insufficient.  Later this same day, Company management sent this response to Sino IC Capital.

62.     On September 1, 2016, Defendant Tacelli and Gallenberger met with Party G. During this meeting, Party G discussed a potential joint venture with Xcerra in China.  Defendant Tacelli and Gallenberger responded that they appreciated the proposal but did not believe such a venture would result in meaningful value to the Company and Xcerra was not in a position to pursue a joint venture with Party G.

63.     On September 2, 2016, Party G informed Cowen that it was not interested in pursuing a strategic transaction with Xcerra at that time.

64.     On September 6, 2016, Defendant Tacelli and Sino IC Capital discussed the purchase price in the Initial IOI via email and Defendant Tacelli reiterated that the Board believed the purchase price in the Initial IOI was insufficient.

65.     On September 9, 2016, Cowen held discussions with Sino IC Capital Financial Advisor and also indicated that the Board required a higher per share purchase price to continue discussions with Sino IC Capital.

66.     On September 15, 2016, Sino IC Capital Financial Advisor sent Cowen a revised non-binding verbal offer under which Sino IC Capital would acquire 100% of Xcerra's outstanding common stock for $8.50 per share in cash (the "Revised IOI").  The closing price of Xcerra's common stock on September 15, 2016 was $5.68 per share.

67.     On September 26, 2016, Defendant Tacelli held a phone call with Sino IC Capital and Defendant Tacelli informed it that the Revised IOI price was still insufficient.

68.     On September 30, 2016, Defendant Tacelli directed Cowen to inform Sino IC Financial Advisor that the price in the Revised IOI was insufficient, which Cowen did on October 7, 2016.

69.     On October 17, 2016, the Strategic Committee held a phone call attended by three other Board members and certain members of Company management.  During this meeting, the Strategic Committee reviewed recent discussions with Sino IC Capital and determined to send Defendant Tacelli and Gallenberger to meet with Sino IC Capital in Beijing, as they were invited by Sino IC Capital to do so.

70.     On October 24, 2016, Defendant Tacelli, Gallenberger, and Cowen met with Sino IC Capital in Beijing, China and discussed a potential strategic transaction as well as the offer price in the Revised IOI.

71.     On October 31, 2016, Defendant Tacelli held a phone call with Sino IC Capital to discuss the Revised IOI purchase price.

72.     On November 7, 2016, Cowen received a second revised non-binding verbal offer from Sino IC Capital Financial Advisor under which Sino IC Capital would acquire 100% of Xcerra's outstanding common stock for $9.25 per share in cash (the "Second Revised IOI").  The closing price of Xcerra common stock on November 7, 2016 was $5.50 per share.

73.     On November 9, 2016, the Strategic Committee held a telephonic meeting attended by four other members of the Board and certain members of Company management.  During this meeting, Defendant Tacelli updated the Strategic Committee on negotiations with Sino IC Capital and the terms of the Second Revised IOI.  Following this discussion, the Strategic Committee directed Defendant Tacelli to continue discussions with Sino IC Capital.  Later that same day, Defendant Tacelli and Gallenberger requested Sino IC Capital to provide its best and final offer.

74.     On November 18, 2016, Sino IC Capital informed Defendant Tacelli of its third revised non-binding offer containing an offer price of $9.55 per share in cash (the "Third Revised IOI").  The closing price of Xcerra's common stock on November 18, 2016 was $6.58.  Later that

same day, Defendant Tacelli updated the Strategic Committee of the Third Revised IOI. Following a discussion on the Third Revised IOI, each director present at this meeting (all directors, excluding Defendant Wright whom Defendant Tacelli had previously discussed the Third Revised IOI with and had expressed support for the Third Revised IOI) determined that pursuing a strategic transaction under the terms of the Third Revised IOI with Sino IC Capital was in the best interests of Xcerra and Xcerra's stockholders. The Board members present then instructed Defendant Tacelli to request a formal, written offer representing the terms of the Third Revised IOI from Sino IC Capital. Later on that same day, Defendant Tacelli communicated such request to Sino IC Capital.

75. On November 28, 2016, Cowen received a written letter of intent from Sino IC Capital Financial Advisor, dated November 25, 2016, representing an offer from Sino IC Capital to acquire 100% of Xcerra's outstanding common stock for $9.55 per share in cash (the "Letter of Intent"). The closing price of Xcerra's common stock on November 25, 2016 was $6.76 per share.

76. On November 29, 2016, the Board met, excluding Defendant Titinger who was late and had previously expressed support for the Letter of Intent to Defendant Tacelli, and discussed the Letter of Intent, the potential for Xcerra to continue as a standalone company, the volatility of Xcerra's stock price, and growth prospects in the Chinese Market. The Board also discussed its intent that a definitive agreement entered into with Sino IC Capital would contain a "go-shop" period. Following this discussion, the Board unanimously approved the Letter of Intent, agreed to an exclusive negotiation period so long as Sino IC Capital permitted a "go-shop" period to be included in the definitive agreement, and directed management to continue discussions and begin drafting a definitive agreement. Defendant Titinger then joined the meeting, expressed his support

for the Letter of Intent and ratified the Board's approval of the Letter of Intent and the exclusive negotiation period (subject to a "go shop" period being included in the definitive agreement).

77.     On November 30, 2016, Defendant Tacelli signed the Letter of Intent and Cowen delivered it to Sino IC Capital and also reiterated that the definitive agreement would contain a "go shop" period.

78.     From December 13, 2016 through December 21, 2016, Sino IC Capital conducted due diligence of Xcerra.

79.     On January 7, 2017, Sino IC Capital's outside counsel, Wilson Sonsini Goodrich and Rosati P.C. ("Wilson"), provided Xcerra's outside counsel, Latham & Watkins LLP ("Latham & Watkins") with a draft merger agreement.

80.     During January 2017 and February 2017, Sino IC Capital continued its due diligence of Xcerra and Wilson and Latham & Watkins negotiated the terms of the merger agreement.

81.     On February 21, 2017, Xcerra released its second quarter results.  The closing price of Xcerra's common stock on the first full day of trading following this release was $9.03, up approximately 34% from the first full day of trading on December 2, 2016 following Xcerra's announcement of its first quarter results.

82.     On February 22, 2017, at the direction of Company management, Cowen informed Sino IC Capital that due to the recent earnings announcement and upward trend in Xcerra's stock price, the offer price was no longer sufficient and that Sino IC Capital would need to raise its offer in order to continue discussions.

83.     On February 24, 2017, Defendant Tacelli held a phone call with Sino IC Capital and reiterated that in light of Xcerra's current stock price, Sino IC Capital's offer price had to increase if discussions were to continue.

84.     On March 1, 2017, Defendant Tacelli and Gallenberger met with Sino IC Capital in Shanghai, China and discussed the terms of the merger agreement.  During this meeting, Sino IC Capital relayed a verbal increase to the offer price from $9.55 to 10.25 per share.  The closing price of Xcerra's common stock on March 1, 2017 was $8.91 per share.

85.     On March 7, 2017, Wilson sent Latham & Watkins a revised draft merger agreement.

86.     On March 9, 2017, Wilson and Latham & Watkins held a phone call to discuss certain terms under the merger agreement, including matters related to employee retention post-closing.

87.     On March 16, 2017, Defendant Tacelli and Gallenberger met with Sino IC Capital in Shanghai, China, and discussed certain remaining key issues in the merger agreement.  During this meeting, Sino IC Capital introduced Unic Capital, an affiliate of Sino IC Capital, as a party to enter into the potential transaction.

88.     From March 16, 2017 through April 4, 2017, Wilson and Latham & Watkins continued to negotiate the terms of the merger agreement and related items.

89.     On March 23, 2017, Wilson delivered a revised merger agreement under which Unic Capital would serve as parent and Sponsor would provide financing for the deal.

90.     On April 7, 2017, Cowen provided its fairness opinion and a presentation of parties that might be interested in, and capable of, an acquisition of Xcerra that Cowen would reach out to during the "go shop" period contained in the merger agreement.  The Board approved the merger

agreement, which contained a $10.25 offer price per share, directed Company management to enter into the merger agreement, and determined to recommend Xcerra stockholders vote in favor of the merger agreement.  The Board then directed Cowen to begin the outreach process pursuant to the "go shop" period.

91.     Following the Board meeting on April 7, 2017, the merger agreement with Unic Capital was executed and delivered.

92.     On April 10, 2017, Sino IC Capital and Xcerra issued a joint press release announcing the agreement, reading in relevant part:

NORWOOD, Mass., April 10, 2017 (GLOBE NEWSWIRE) -- Xcerra Corporation (NASDAQ:XCRA) and Sino IC Capital Co. Ltd. today announced that Xcerra and an affiliate of Sino IC Capital , Unic Capital Management Co., Ltd., have entered into a definitive agreement under which Unic Capital Management Co., Ltd., will acquire all outstanding shares of Xcerra for $10.25 per share in cash. The transaction price represents approximately a 16 percent premium to Xcerra's average closing price over the 30 trading day period ending April 7, 2017, approximately a 28 percent premium to Xcerra's average closing price over the 90 trading day period ending April 7, 2017, and values Xcerra's equity at approximately $580 million on a fully diluted basis.

Xcerra's Board of Directors has unanimously approved the transaction. Xcerra expects no changes to the day-to-day operations of the company and expects that Xcerra's existing management will continue to run the company.

Xcerra Corporation designs and manufactures test equipment and other related products for testing semiconductors and printed circuit boards, which are used in a variety of commercial industries including consumer electronics, automotive, and industrial. Xcerra does not design or manufacture semiconductor devices; Xcerra sells test and handling equipment and related products to semiconductor designers and manufacturers who use Xcerra products to test their devices during the manufacturing process.

Dave Tacelli, president and chief executive officer of Xcerra said: "The partnership we have announced today with Sino IC Capital will deliver strong value for our shareholders and will also benefit our customers and employees. With the financial backing of such a prominent and respected private equity fund, Xcerra will be well positioned for future growth, both in new and existing markets. We believe this partnership will enable the company to make long term investments in innovation

and product development as well as broaden and strengthen our customer relationships around the world."

Mr. Jun Lu, president of Sino IC Capital, added, "Xcerra's leadership team and employees have delivered quality products and innovations to their customers and the marketplace for over four decades.  Our partnership with and investment in Xcerra will help build on this track record of success and accelerate the company's ability to access new markets, develop new product lines, and serve more customers.  We value the entire Xcerra team and are committed to keeping the company's headquarters in Norwood, Massachusetts. Sino IC Capital and Xcerra will work closely together with regulators, in an open and transparent manner, as they evaluate the merits of the transaction."

The transaction is subject to a number of conditions, including approval by Xcerra's shareholders as well as antitrust and other regulatory approvals including from relevant authorities in China and from the Committee on Foreign Investment in the United States (CFIUS).  The transaction is currently expected to close before the end of the calendar year.

The merger agreement includes a "go-shop" period, during which Xcerra will actively solicit alternative proposals from third parties for the next 35 days continuing through May 12, 2017. The merger agreement requires Xcerra to pay a termination fee of $14,250,000 to an affiliate of Sino IC Capital if Xcerra terminates the merger agreement in connection with a superior offer that arose during the go-shop period and a termination fee of $22,800,000 if Xcerra terminates the merger agreement in connection with a superior proposal that arose following the go-shop period. There can be no assurance that this process will result in a superior proposal. Xcerra does not intend to disclose developments with respect to the solicitation process unless and until its Board of Directors has made a decision with respect to any potential superior proposal.

Cowen and Company, LLC is serving as Xcerra's financial advisor and Latham & Watkins LLP is serving as Xcerra's legal advisor. Grant Thornton International is serving as Sino IC Capital's accounting advisor and Wilson Sonsini Goodrich & Rosati is serving as Sino IC Capital's legal advisor.

93.    During the "go shop" period, Cowen reached out to 55 parties (33 strategic parties and 22 financial sponsors), to solicit interest in a potential acquisition of Xcerra.  Of the 55 parties contacted, one party, Party I, entered into a confidentiality agreement with Xcerra and gained access to certain non-public information regarding Xcerra.  On April 14, 2017, Party I informed Company management that it was not interested in pursuing a strategic transaction with Xcerra.

94.     The "go shop" period expired on May 12, 2017.  None of the 55 parties contacted, nor any other party has submitted a proposal to acquire Xcerra as of the date of the Proxy.

95.     On August 4, 2017, Unic Capital, Parent, and Xcerra entered into an Assignment and Assumption Agreement, pursuant to with Unic Capital assigned its rights under the Agreement to Parent.  The Merger Agreement, as amended, was thereafter between, Parent, Sponsor, Merger Sub and Xcerra.

***The Proxy Misleads Xcerra Stockholders by Omitting Material Information***

96.     On August 7, 2017, Xcerra filed a materially misleading Proxy with the SEC.  The Proxy is rendered materially misleading by the omission of critical information concerning: (i) the process that led up to the execution of the Merger Agreement, including the solicitation and offer review process; (ii) information regarding potential conflicts of interest faced by Xcerra senior management when leading the search for strategic alternatives that ultimately resulted in the execution of the Merger Agreement; (iii) information regarding potential conflicts of interest concerning Cowen, Parent, and Sino IC Capital's financial advisor; and (iv) Cowen's financial analyses conducted in preparing its fairness opinion;.

97.     As such, the Proxy, which recommends that the Company's stockholders vote their shares in favor of the Proposed Transaction, misrepresents and/or omits material information in violation of Sections 14(a) and 20(a) of the Exchange Act and SEC Rule 14a-9.

*Misleading Statements and Omissions Regarding the Non-Disclosure Agreements*

98.     The Proxy discloses that Xcerra entered into non-disclosure agreements with Party B, Party C, Party D, Party E, Party F, Party G, Party H, and Party I.  While the Proxy expressly states that the Company entered into numerous non-disclosure/confidentiality agreements with potential bidders, the Proxy fails to disclose whether such agreements contained standstill

provisions, and the terms of such standstill provisions.  In particular, if the non-disclosure agreements did, in fact, contain standstill provisions, the Proxy further fails to disclose whether such standstill provisions in the non-disclosure/confidentiality agreements Xcerra entered into with potential suitor counterparties are currently operating to restrain the counterparties from making a superior offer or topping bid for the Company, and/or if they contained don't-ask-don't-waive provisions or other terms that contractually prohibit the counterparties from seeking a waiver of any standstill provision terms.  Without this information, the Company's stockholders are being misled to believe that all of these counterparties have been and are currently free to make a superior offer to acquire the Company.

### *Potential Conflicts Facing Company Management and Directors*

99.     The Proxy is actively misleading regarding employment discussions taking place during the period leading up to the execution of the Merger Agreement.

100.    The Proxy states that "[p]rior to or following the closing of the Merger, certain of our executive officers may have discussions, or may enter into agreements with, Parent or Merger Sub or their respective affiliates regarding employment . . .."  However, the Proxy also states, that on March 9, 2017, Latham & Watkins negotiated with Wilson on "various open issues in the draft merger agreement, including . . . matters related to employee retention . . .."

101.    The foregoing statements relating to the continued employment of Xcerra's executive employees are at best misleading.  If "matters related to employee retention" were an open issue, then there had to have been some discussion regarding such, or at the very least, mention by Sino that it was interested in retaining employees.  Given that Sino is comprised of various private equity and investment management buyers, rather than being a strategic purchaser,

the likelihood is very high that Sino pursued communications regarding its intention to retain management, as similarly situated buyers often do in such transactions.

102.    Contrary to the disclosure in the Proxy, the continuing employment of Xcerra management after the close of the Proposed Transaction appears to be a foregone conclusion.  In the press release announcing the Proposed Transaction, Defendant Tacelli, Xcerra's president, CEO and a member of the Board, stated, "[t]he partnership we have announced today with Sino IC Capital will deliver strong value for our shareholders and will also benefit our customers and employees."  Similarly, in the same press release, Jun Lu, president of Sino IC Capital, stated, "[w]e value the entire Xcerra team and are committed to keeping the company's headquarters in Norwood, Massachusetts."

103.    Despite these explicit and clear public statements by Defendant Tacelli and Jun Lu, the Proxy actively misleads Xcerra stockholders into believing that **no discussions** regarding continued employment of management took place.  While formal agreements on this issue may not have been reached, it is clear that some communications took place.

104.    This information is particularly material with respect to Defendant Tacelli, as he was instrumentally involved in the negotiations with Sino IC Capital throughout the sale process.  For example, as referenced above, Defendant Tacelli and Gallenberger rejected a competing proposal from Party G without discussing such with the Board first and Defendant Tacelli unilaterally held negotiations with Sino IC Capital without being directed to do so by the Board nor the Strategic Committee.  Any communications – even one-sided written indications in proposals or other written communications – concerning post-merger employment between Sino IC Capital or its affiliates and Defendant Tacelli, or any other Xcerra officers, directors, or employees, during the sale process, would be material to a stockholder's decision as to whether to

21

vote in favor of the Proposed Transaction.  Such communications give rise to substantial undisclosed conflicts of interests.

105.    Statements that "certain of our executive officers may have discussions" are rendered materially misleading by the omission of material facts regarding the timing and nature of employment communications and negotiations, which undoubtedly occurred.

106.    The failure to disclose the content and timing of such discussions materially misleads Xcerra stockholders as to the potential conflicts of interest faced by Company management and the Board in supporting the merger. The omitted information relating to the timing, content, and parties involved in these communications concerning the retention of Xcerra's management and directors would significantly alter the total mix of information that Defendants have disclosed to solicit stockholder approval of the Proposed Transaction.  The conflicts of interests created and fostered by such communications would affect the stockholders' perception and analysis of the entire process and the ultimate fairness of the Proposed Transaction.  Thus the statements in the Proxy are rendered materially misleading by these omissions.

### *Potential Conflicts Concerning Parent and "Sino IC Capital Financial Advisor"*

107.    With respect to Parent, the Proxy fails to disclose who the actual owners of Parent are, and thus whether such persons and/or entities would have raised serious conflicts of interest for Cowen, the Board and/or members of Xcerra's senior management team.  For example, the Proxy merely states that "the general partner of Parent is a limited liability company formed under the laws of the PRC in 2017. . .," that "Unic Capital is the controlling shareholder of such general partner," and that "Sponsor is the largest limited partner of Parent."  However, the Proxy fails to disclose: (i) the name of Parent's general partner; (ii) the identity of other partners involved in owning Parent; and (iii) the identity of other partners and/or limited partners that own "the general partner of Parent."  In short, the Proxy uses an unnecessarily vague, ambiguous and deceptively

worded descriptions of Parent seemingly as to avoid disclosing the actual identities of the parties involved in the Proposed Transaction. Moreover, given the last minute assignments and assumptions of rights on August 4, 2017, the identities of who is actually behind this transaction are especially relevant and material to Xcerra stockholders, and more than likely, the SEC as well.

108.    With respect to Sino IC Capital's financial advisor, the Proxy fails to ever identify who its financial advisor was throughout the sale process leading up to the Merger Agreement. This is especially apparent and clearly an attempt to obfuscate the financial advisor's identity as the Proxy chooses to ambiguously define Sino IC Capital's financial advisor as simply "Sino IC Capital Financial Advisor." The identity of this advisor is necessary for shareholders to determine whether this financial advisor raised serious conflicts of interest for itself, for Cowen, or any member of Xcerra's Board and/or senior management.

109.    Moreover, "Sino IC Capital Financial Advisor" was instrumentally involved throughout the negotiation process between Xcerra and Sino IC Capital. For example, on August 27, 2017, "Sino IC Capital Financial Advisor" unilaterally rejected a counterproposal from Cowen, who submitted such at the direction of the Board, without bringing the proposal to Sino IC Capital. Accordingly, not only should the Proxy disclose the identity of "Sino IC Capital Financial Advisor," but it should also disclose any material contacts and relationships it has had with Cowen, the Board and/or any of Xcerra's senior management.

### *Misleading Statement and Omissions Regarding Cowen's Financial Analysis*

110.    The Proxy describes Cowen's fairness opinion and the various valuation analyses it performed in support of its opinion. However, the description of Cowen's fairness opinion and analyses fails to include key inputs and assumptions underlying these analyses. Without this information, as described below, Xcerra's public stockholders are unable to fully understand these

analyses and, thus, are unable to determine what weight, if any, to place on Cowen's fairness opinion in determining whether or not to vote in favor of the Proposed Transaction. This omitted information, if disclosed, would significantly alter the total mix of information available to Xcerra's stockholders.

111.    With respect to Cowen's *Analysis of Selected Publically Traded Companies*, the Proxy fails to disclose the individual multiples and financial metrics for the companies observed by Cowen in its analysis.

112.    With respect to Cowen's *Analysis of Selected Transactions*, the Proxy fails to disclose the individual multiples and financial metrics for the companies observed by Cowen in its analysis. The disclosure of such multiples is necessary because they are a crucial element of these analyses, as the analysis is based on comparison and relative valuation. Without such disclosure, stockholders are unable to determine whether the range of multiples selected by Cowen reflects appropriately comparable transactions to the Proposed Transaction. Failure to disclose this information renders the statements in the Proxy made by Cowen pertaining to the fairness of the Proposed Transaction misleading.

113.    Without the foregoing omitted information, the Company's stockholders are being misled as to the reliability of and basis for Cowen's fairness opinion.

## CLAIMS FOR RELIEF

## COUNT I

**Claim for Violation of Section 14(a) of the 1934 Act, and SEC Rule 14a-9 Promulgated Thereunder, Against the Individual Defendants and Xcerra**

114.    Plaintiff repeats and re-alleges the preceding allegations as if fully set forth herein.

115.    The Individual Defendants disseminated the false and misleading Proxy, which contained statements that, in violation of Section 14(a) of the Exchange Act and SEC Rule 14a-9,

in light of the circumstances under which they were made, omitted to state material facts necessary to make the statements therein not materially false or misleading.  Xcerra is liable as the issuer of these statements.

116.    The Proxy was prepared, reviewed, and/or disseminated by the Individual Defendants.  By virtue of their positions within the Company, the Individual Defendants were aware of this information and their duty to disclose this information in the Proxy.

117.    The omissions and misstatements in the Proxy are material in that a reasonable stockholder will consider them important in deciding how to vote on the Proposed Transaction.  In addition, a reasonable investor will view a full and accurate disclosure as significantly altering the total mix of information made available in the Proxy and in other information reasonably available to stockholders.

118.    The Individual Defendants were aware of their duty to disclose this information, and yet omitted such at least recklessly or negligently.  The material information described above that was omitted from the Proxy takes on actual significance in the minds of Xcerra's stockholders in reaching their decision whether to vote in favor of the Proposed Transaction.  Absent disclosure of this material information prior to the vote on the Proposed Transaction, Plaintiff and the other members of the Class will be unable to make an informed decision about whether to vote in favor of the Proposed Transaction and are thus threatened with irreparable harm for which damages are not an adequate remedy.

119.    The Proxy is an essential link in causing Plaintiff and the Company's stockholders to approve the Proposed Transaction.

120.    By reason of the foregoing, Defendants violated Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder.

121.    Because of the false and misleading statements in the Proxy, Plaintiff and the Class are threatened with irreparable harm. Accordingly, Plaintiff seeks injunctive and other equitable relief to prevent the irreparable injury that Company stockholders will continue to suffer absent judicial intervention.

## COUNT II

**Claim for Violation of Section 20(a) of the 1934 Act
Against the Individual Defendants**

122.    Plaintiff repeats and re-alleges the preceding allegations as if fully set forth herein.

123.    The Individual Defendants acted as controlling persons of Xcerra within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of Xcerra and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Proxy, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are false and misleading.

124.    Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause them to be corrected.

125.    In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and therefore, is presumed to have had the power to control and influence the particular transactions giving rise to the violations as alleged herein, and exercised the same.  The Proxy contains the unanimous recommendation of the

Individual Defendants to approve the Proposed Transaction.  They were thus directly involved in the making of the Proxy.

126.    By virtue of the foregoing, the Individual Defendants violated Section 20(a) of the Exchange Act.

127.    As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) of the Exchange Act and Rule 14a-9, by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' conduct, Plaintiff and the Class are threatened with irreparable harm.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.    Declaring that this action is properly maintainable as a class action and certifying Plaintiff as the Class representative and his counsel as Class counsel;

B.    Preliminarily and permanently enjoining Defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Proposed Transaction;

C.    In the event Defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding Plaintiff and the Class rescissory damages;

D.    Directing the Individual Defendants to disseminate a Proxy that does not contain any untrue statements of material fact and that states all material facts required in it or necessary to make the statements contained therein not misleading;

E.    Declaring that Defendants violated Sections 14(a) and/or 20(a) of the Exchange Act, as well as Rule 14a-9 promulgated thereunder;

F.      Awarding Plaintiff the costs of this action, including reasonable allowance for Plaintiff's attorneys' and experts' fees; and

G.      Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff respectfully requests a trial by jury on all issues so triable.

Dated: August 22, 2017                          Respectfully submitted,

                                                **MATORIN LAW OFFICE, LLC**

                                                */s/ Mitchell J. Matorin*
                                                Mitchell J. Matorin (BBO# 649304)
                                                18 Grove Street, Suite 5
                                                Wellesley, MA 02482
                                                (781) 453-0100
                                                mmatorin@matorinlaw.com

**OF COUNSEL:**

**LEVI & KORSINSKY LLP.**                       *Attorneys for Plaintiff*
Donald J. Enright
Elizabeth K. Tripodi
1101 30th Street, N.W., Suite 115
Washington, DC 20007
Tel: (202) 524-4290
Fax: (202) 337-1567